# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# SOUTHWESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | Criminal Action |
| ) | No. 08-03026-03-CR-S-RED |
| BRYAN THOMAS RAY, ) | |
| ) | |
| Defendant. ) | |

## REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

Defendant filed a Motion to Suppress Evidence, in which he asserts that items seized and statements made as a result of a search of his hotel room on February 19, 2008, should be suppressed. The United States filed its response. The matter was set for an evidentiary hearing, which was held before the undersigned on August 24, 2009. The defendant was present with counsel, Rose Barber, and the United States was represented by Randall Eggert, Assistant United States Attorney.

Defendant contends that evidence and statements should be suppressed because he was illegally detained and arrested, and was not properly Mirandized after his arrest. He asserts that the police did not have reasonable suspicion to force him to the ground and handcuff him because he did not match the physical description of the original suspect. He also contends that the officers did not use the least intrusive means to ascertain his identity because he was not acting suspiciously, there was no sign of a weapon, and the frisk turned up no weapon. It is defendant's assertion that

1

once he was placed under arrest, it does not appear that the officer properly <u>Mirandized</u> him and he did not affirmatively state that defendant's statements were volunteered utterances.

It is the government's position that the police had reasonable suspicion to approach defendant because they believed him to either be, or be associated with, co-defendant Jason Hamann, whom the police were investigating. It is also contended that defendant was not asked interrogation-type questions at the scene while he was in custody, and was properly <u>Mirandized</u> later.

The government first called Officer Ben King of the Springfield Police Department. He came into contact with defendant on February 20, 2008. Officer King had information that Jason Hamann was at the Extended Stay Hotel in Springfield, Missouri. The Springfield Police Department was conducting a counterfeiting investigation at the time, and Mr. Hamann was wanted for questioning, plus he had several outstanding felony warrants. An informant had contacted the police department on February 19, 2008. He advised them that he had gotten a counterfeit bill from Hamann that evening, and that Hamann had a handgun in his hotel room. He also advised them the Hamann had chemicals to use in washing bills, a computer and printer, and that he saw other bills in the process of being washed or printed in the room. Officer King and a narcotics officer who had received the call from the informant went to the hotel to conduct surveillance on Mr. Hamann's room, which was Room 302, on the night of February 19. Officer King was inside conducting surveillance in a room across the hall from Hamann's room with two other officers. There were also officers outside, and one of them recognized a black Nissan Xterra that pulled into the parking lot. The Xterra was the vehicle of one of the suspects in the counterfeiting case, Kirsten Kraichely. The vehicle pulled up to the hotel on the east side, and at that time, one of the officers with Officer King

2

observed the subject, believed to be Mr. Hamann, exit Room 302. The subject went to the stairwell, exited the hotel on the east side, and entered the Xterra. The officers on the outside, at that time, believed this to be Mr. Hamann, although this was not confirmed because of the distance between the officer and the subject. The officers outside tried to apprehend the subjects in the vehicle, but they fled the scene. The vehicle was subsequently abandoned, and the subjects, male and female, fled the area. Officer King went back to the room, where other officers with the Special Response Team had entered and secured it, thereafter obtaining a search warrant. Officer King observed chemicals, bills, and a printer there in the room. The laptop had been located in the Xterra. The search warrant was actually executed on February 20, 2008, in the early morning hours. Later on the 20th, the confidential informant contacted law enforcement and said that Mr. Hamann was headed towards the Arbor Suites Hotel. He was reported to be en route to obtain a room there, in a burgundy Ford Taurus. Officer King reiterated that when they received this information about Mr. Hamann, they believed him to be armed and dangerous, with outstanding felony warrants, in addition to being wanted on probable cause charges for having fled from the officers at the Extended Stay Hotel. The officers set up surveillance at the Arbor Suites, and observed the Taurus enter the parking lot at the hotel, drive around the entire complex, and then exit. One of the officers, Corporal Ventage, obtained the license plate number, which indicated that the vehicle belonged to Jarrod Walker. According to the informant, Mr. Walker was in the vehicle with Mr. Hamann. Because there were four subjects in the vehicle, the officer testified that they were fairly certain that Mr. Hamann was one of them. They started conducting surveillance on the vehicle; he heard radio traffic that a subject had exited the vehicle and started walking towards the Extended Stay, where they had been the previous evening. The officer who made the call was not able to contact the

subject because he was maintaining surveillance on the vehicle. Therefore, Officer King went to the area with the intention of contacting the subject on foot. It was about 2:00 p.m. and a sunny day when these events occurred. The officer pulled into the hotel parking lot, and saw the subject just entering the parking lot and walking towards the front door of the hotel. He exited his vehicle and ordered the subject onto the ground. When he approached the subject, he believed it was Mr. Hamann; the individual was the same height, was a white male, and had brown hair. The subject's back was towards him, so he couldn't see his face. He had the subject get on the ground, which he did. The officer had his service revolver in the "low ready position," and had him stay on the ground until back-up officers arrived. Corporal Ventage placed him in handcuffs. Officer King testified that they took this action because he believed it was Hamann, whom he believed to be armed and dangerous. After detaining the subject in handcuffs, Corporal Ventage patted him down for weapons, and none were located. They then sat him up, and he identified himself as defendant, Bryan Ray. They then ran a records check on him, confirmed who he was, and discovered that he had a warrant for felony stealing in Greene County. Because there was a felony warrant for his arrest, Officer King arrested him. Before he had arrested him, but while he was in handcuffs, the officer asked defendant what he was doing at the hotel. He said Jason had asked him to come to the hotel, go to room 302, and obtain some items out of the room for him. He indicated he did not know Jason very well. In the course of a search incident to defendant's arrest, the officer searched his wallet, where he found a key card for the Extended Stay, and a washed dollar bill. In a pocket, he found a map of the area of Gasconade and Highway 65, which was where the Xterra had been abandoned the night before. That piece of paper also had a note reading "Extended 302." [Tr. 13]. On the other piece of paper were several phone numbers, one of which had the name "Nubbs"

4

written next to it. [Tr. 13]. The officer knew this was a nickname for Mr. Hamann. In a back pocket, he also found a glass smoking pipe, commonly used to smoke controlled substances. At this point, the officer contacted Detective Wilson, who advised him to take defendant to Springfield Police Headquarters to be interviewed. He was transported by a marked patrol car by Officer Angela Burgess. From the time of contact until Officer Burgess arrived was about 20 minutes. He had no further contact with defendant.

On cross examination, Officer King testified that he had no personal contact with Hamann or defendant on the 19th. Before he arrested defendant, he had not had any personal contact with Mr. Hamann. It took about the 5-10 minutes to run the records check. During that time, he admitted that he questioned defendant about how he knew Hamann and what he was doing with him. The officer testified that their main focus was to find Mr. Hamann, and they believed defendant had information that would be helpful. At that point, although defendant was in handcuffs and detained, he had not been <u>Mirandized.</u> Hamann has the nickname "Nubbs" because he is missing some fingers. The officer did not see anything like this before he put defendant on the ground. When he searched defendant's pockets, it was after the records check and after he had been placed under arrest. Before this, while he was handcuffed and sitting on the ground, he was not free to leave. There were two officers there at the time.

On redirect, he testified that he did not know about Mr. Hamann's nickname or the reason for it on the day in question; he discovered this later.

The next witness for the government was Micah Dent, Special Agent for the Secret Service. He was involved in investigating the counterfeit case focusing on Jason Hamann. Law enforcement was attempting to contact Haman and any associates of his. The witness came into contact with

5

defendant on February 20, 2008. He was working with Corporal Wilson, the liaison officer with the Secret Service, and received the information that defendant had been let out of the Ford Taurus before Hamann fled in it. They were headed toward the hotel when they received information that defendant was in custody, and had a map of the area where the Xterra had been abandoned, plus a bleached $1.00 bill. This made him suspicious that defendant might be involved in the counterfeiting operation. They met with defendant at the Springfield Police Department, where he was sitting in an interview room, in street clothes and without handcuffs. Officer Dent was present when Corporal Wilson read defendant his <u>Miranda</u> rights. He was present and observed that a written waiver was signed by both defendant and the officer. After defendant had signed the written waiver, Officer Dent started questioning him. Defendant admitted that he had been with Jason Hamann, that they'd driven around the area, and stated that he was in contact with him earlier that day to get narcotics from him. Defendant eventually admitted to passing several counterfeit bills for Hamann. Officer Dent asked several of the questions, and defendant never asked him to stop. After they finished questioning him, he was transported to the Greene County Jail. When Corporal Wilson read defendant his rights, it was just a verbatim reading, with no violent tone. There was also no violent or threatening demeanor on the officer's part.

On cross examination, the officer testified that he was most interested in Hamann and in the gun that they believed was in his possession at the beginning of his contact with defendant. He knew defendant had been arrested that day in the parking lot of the hotel. He admitted that it was clear to the officers at the scene that Hamann was in the vehicle that had sped off. His interview with defendant occurred before he was booked at the Greene County Jail. At Corporal Wilson's direction, defendant was sent to the headquarters so the Secret Service could talk to him before he

6

was booked at the jail. Defendant had not been arrested on any federal charges when he was conducting the interview or after he was taken to the jail.

On redirect, the witness testified that the car chase with Mr. Hamann occurred after defendant had dropped off at the Extended Stay.

Defendant asserts that when he was approached by Sergeant King, this was not a proper Terry stop; that the police did not have probable cause to arrest him; and that he was not properly Mirandized.

The Supreme Court has placed police-citizen encounters into three categories. United States v. Poitier, 818 F.2d 679, 863 (8th Cir. 1987). First, there are communications that are consensual and involve no coercion or restraint, which are outside the scope of the Fourth Amendment. Id. at 863; Terry v. Ohio, 392 U.S. 1, 19 (1968). In contrast, Terry stops do invoke Fourth Amendment protection. In such an encounter, a police officer may stop and briefly question an individual, may ask for identification, and may conduct a limited pat down, if the officer has a reasonable suspicion of criminal activity. Id. at 19. Finally, there are "highly intrusive, full-scale arrests, which must be based on probable cause." Id.

Having fully reviewed the evidence, the Court finds that, based on the credible testimony adduced at the hearing, Officer King had reasonable suspicion of criminal activity to support his actions. The relevant factors this Court finds persuasive regarding the legality of the initial detention are the fact that the officers were investigating a counterfeiting operation, focused on Jason Hamann, whom they had been informed was armed and had outstanding felony warrants. Pursuant to their investigation and surveillance, Hamann had been seen exiting Room 302 at the Extended Stay Hotel on the night of February 19th. He then fled from police and abandoned a vehicle, which was

believed to belong to a person involved in the counterfeiting. A search warrant executed on the hotel room resulted in the seizure of items relating to a counterfeiting operation. The officers had another report from the informant on the 20th that Hamann was en route to the Arbor Suites Hotel. A vehicle seen during surveillance at that hotel was confirmed as being registered to Jarrod Walker, who the police believed was with Hamann. There were four persons inside the vehicle, one of whom the police believed to be Hamann. The officers followed the vehicle to the Extended Stay where they been the night before, and a person exited the vehicle there, walking towards the hotel. Officer King believed that this person was Mr. Hamann because of the reasons delineated herein, as well as his belief that the individual fit Hamann's description. The officer testified that although he could not see the person's face, because his back was towards him, he was the same height as Hamann, was a white male, and had brown hair. The Court is satisfied that the officer had reasonable cause to believe that he was stopping Mr. Hamann and that criminal activity was occurring or likely to occur when he approached and stopped defendant. The actions taken in having defendant get down on the ground and handcuffing him, and briefly patting him down for officer safety while determining his identify were appropriate within the purview of Terry. The officers believed the subject to be Hamann, who was being investigated for criminal activity, was a wanted felon, was believed to be in possession of a weapon, and had eluded police the previous night. Once defendant's identity was confirmed and the officers discovered that he had an outstanding felony warrant, the Terry stop evolved into a proper arrest, based on probable cause, and the subsequent search incident to arrest was proper.

Regarding the statements made by defendant before he was arrested, Officer King testified that he questioned defendant about how he knew Hamann and what he was doing with him. The

8

officer testified that their main focus was to find Mr. Hamann, and once they found out that their subject was not Hamann, they believed defendant had information that would be helpful. The Court finds that based on the credible testimony of Officer King, the statements made by defendant regarding his association with Hamann were not made in response to a custodial interrogation by the police officer. The questions were not interrogatory in nature, and were not designed to elicit incriminating information about any criminal activity involving defendant, who was not a suspect at the time, but rather, were asked in an attempt to track down Hamann, who had eluded police the night before.

Further, the Court finds that statements made after defendant was properly <u>Mirandized</u> at police headquarters should not be suppressed. The credible testimony adduced at the hearing establishes that defendant was properly read his rights and signed a written waiver before he spoke with Special Agent Dent, pursuant to <u>Miranda v. Arizona,</u> 384 U.S. 436, 444-45 (1966). Even if there were no federal charges at the time, defendant had obviously been read his rights and waived them when he spoke to Special Agent Dent.

Based on a careful review of the totality of the circumstances under the particular facts of this case, the Court finds that the officers had sufficient information to reasonably assume that criminal activity might be occurring when they stopped defendant. Accordingly, their initial investigative detention was lawful under <u>Terry,</u> and their subsequent actions were lawful under the circumstances. Therefore, it will be recommended that defendant's motion to suppress be denied.

For the foregoing reasons, it is, pursuant to the governing law and in accordance with Local Rule 72.1 of the United States District Court for the Western District of Missouri,

RECOMMENDED that defendant's Motion to Suppress Evidence should be denied.

                                       /s/ James C. England
                                      JAMES C. ENGLAND, CHIEF
                                      United States Magistrate Judge

Date:   9/16/07